# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| WOLF MOUNTAIN RESORTS, L.C., a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>ASC UTAH, INC., a Maine corporation, and AMERICAN SKIING COMPANY, a Delaware corporation,<br><br>Defendants. | **MEMORANDUM DECISION & ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION TO CONSOLIDATE**<br><br>Case No. 2:09-CV-1094-DN<br><br>Magistrate Judge David Nuffer |

Plaintiff Wolf Mountain Resorts, L.C., ("Wolf") leases ground to Defendants ASC Utah, Inc. and American Skiing Company (collectively "ASCU") as part of The Canyons Ski Resort under a document known as the "Ground Lease." In this case, Wolf is suing ASCU for alleged breach of contract for underpayment of rent due under the Ground Lease for the years 2006, 2007, 2008, and 2009.[1] ASCU has filed a motion for summary judgment[2] on the ground that Wolf's claims are barred because they should have been raised in prior litigation between the parties. There are several related cases involving these parties,[3] one of which is also pertinent to the motion to consolidate now before the court.

Because the court concludes that a genuine issue of material fact exists as to whether Wolf should have raised its claims in the previous litigation, the court denies the motion for

---

[1] Complaint ¶ 22.

[2] Docket no. 9, filed January 7, 2010.

[3] Plaintiffs' and Defendant's Joint List and Description of Pending Cases, docket no. 60, filed March 5, 2010 in ASC Utah, Inc., et al. v. Wolf Mountain Resorts, L.C., Case No. 2 09 CV 303 DAK-SA, District of Utah.

summary judgment. Because this case is significantly related to another case pending in this court, this case will be consolidated with that other case.

MOTION FOR SUMMARY JUDGMENT

**Undisputed Facts**[4]

1. On July 3, 1997, Wolf and ASCU entered into a Ground Lease Agreement ("Ground Lease"), under which ASCU leased from Wolf a parcel of land in Summit County, Utah, for a period of 50 years . . . . ASCU operates The Canyons ski resort on the leased premises and neighboring land.

2. Article III of the Ground Lease addresses the subject of rent to be paid by ASCU to Wolf. Under § 3.01(a) of Article III of the Ground Lease, ASCU is required to pay Wolf yearly rent equal to 4% of ASCU's "Gross S&L Revenue." This yearly rent is due September 15 of each year, and it "shall be determined with reference to the Gross S&L Revenues actually received by [ASCU] for its preceding 12-month fiscal year ending July 31."[5]

3. Pursuant to § 3.01(c) of the Ground Lease, ASCU must pay Wolf "additional rent" based upon the "volume of paid skier visits" achieved at The Canyons. This "additional rent" is also due by September 15 of each year. The additional rent payment is accompanied by a statement from ASCU "setting forth the skier visits during such period . . . in such detail as [Wolf] and [ASCU] shall from time to time reasonably agree."[6]

4. In June of 2006, ASCU commenced an action against Wolf in the Third Judicial District Court, Summit County, Utah, seeking declaratory and injunctive relief to prevent Wolf from enforcing a Notice of Default claiming that ASCU had breached the Ground Lease by entering into agreements with the owner of certain land leased to Wolf and covered in the Ground lease. *ASC Utah v. Wolf Mountain Resorts, L.C.*, No. 060500297 (Third Judicial District Court, Summit County,

---

[4]The facts are taken from ASCU's Statement of Undisputed Material Facts in its corrected memorandum in support of its motion for summary judgment ("Memorandum in Support") at 4-8, Exhibit A to docket no. 11, filed January 8, 2010. Citations to supporting documents have been omitted. Wolf does not dispute these facts, but adds some additional facts. See Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Opposition Memorandum") at iii, docket no. 16, filed February 8, 2010.

[5]Alteration in original.

[6]Alterations in original.

Utah)("*ASCU v. Wolf Mountain*"). [This case is also referred to as the "First State Rent Case."]

5. ASCU sought a declaratory judgment in that lawsuit regarding "the amount of rent ASCU owes Wolf as rent under the Ground Lease for the 2005-06 fiscal year." The allegations supporting that request included that Wolf contended in an earlier preliminary injunction hearing between the parties that ASCU owed over $4 million in rent for the 2005-06 fiscal year, that ASCU properly calculated rent at $1.64 million, and that the parties disagreed on the correct methodology for calculating "paid skier visits" under Section 3.01(c), Article III of the Ground Lease.

6. On December 15, 2006, Wolf filed an Answer in *ASCU v. Wolf Mountain*. Responding to ASCU's allegations that it had properly calculated rent for the 2005-2006 fiscal year, Wolf maintained that ASCU owed more "additional rent." It also asserted a counterclaim containing an allegation that ASCU was "chip[ping] away at its additional rent obligations" by miscalculating "paid skier visits," thereby affecting the amount of the "additional rent" due under the Ground Lease.[7] Although the counterclaim asserted a cause of action for at least eight enumerated breaches of the Ground Lease, underpayment of rent was not among these enumerated breaches.

7. On December 19, 2006, Wolf initiated the Second State Rent Case, *Wolf Mountain v. ASCU*, which was later consolidated with the First State Rent Case. Wolf's First Amended Complaint in the Second State Rent Case repeated the allegation that ASCU was chipping away at Wolf's rights by mishandling paid skier visits in the calculation for rent payment. However, Wolf did not bring a cause of action in the Amended Complaint for rent deficiency.

8. On March 11, 2008, fifteen months after Wolf missed its opportunity in state court to bring a cause of action for breach of contract for underpayment of rent, Wolf commenced the First Federal Rent Case, alleging that ASCU breached § 3.01 (a) and (b) of Article III of the Ground Lease by miscalculating Gross S&L Revenues. The miscalculation allegedly occurred through ASCU under-reporting the revenue received in the form of lodging rent from 2002 through 2008.

9. The deadline for amending pleadings in the First Federal Rent Case was April 1, 2009. Limited discovery has taken place in the First Federal Rent Case.

---

[7]Alteration in original.

10. In this lawsuit, Wolf contends that ASCU has breached Article III of the Ground Lease by miscalculating both Gross S&L Revenues under Section 3.01(a) and "additional rent" under § 3.01(c). Wolf alleges in this Second Federal Rent case that it entered a written agreement with ASCU in 2000 regarding how to treat the purchase of ski lift tickets by Westgate Resorts, Ltd. ("Westgate") vis a vis § 3.01(c). Wolf claims that starting with the 2005-06 fiscal year, and continuing yearly through the 2008-2009 fiscal year, ASCU inappropriately deducted Westgate tickets from its calculation of the annual Gross S&L Revenues and from its calculation of the "additional rent" due.

11. In compliance with Article III, § 3.01(b) of the Ground Lease, ASCU has, beginning in September 2005, provided Wolf with an annual written statement of how it calculated rent for the prior fiscal year. The written statements clearly delineate that ASCU has deducted Westgate tickets from its rent calculations each year. Under the heading on each annual statement for "Gross S&L Revenues," there is a line-item deduction for "Westgate: Revenue from Tickets," and under the heading for "Additional Rent," there is a line-item deduction for "Westgate."[8]

### Wolf's Additional Facts[9]

Although Wolf does not dispute ASCU's facts, it has provided some additional facts.

1. The Ground Lease requires ASCU to pay rent to Wolf Mountain based on gross revenues. ASCU is required to pay additional rent to Wolf Mountain upon reaching certain milestones in "paid skier visit days," which are to be calculated "using the same methodology employed by American Skiing Company and its affiliated parties at all of their ski resorts, which shall be consistent in all material respects with the methodologies employed generally within the industry."

2. The dispute over rent in the First and Second State Rent Case (now consolidated) is about the *methodology* used by ASCU to calculate "paid skier visit days."

3-4. [In paragraphs 3-4, Wolf quotes from ASCU's First Amended Complaint in the First State Rent Case which explains that ASCU believed that its rent should be based on the actual number of skier visits as determined by ASCU's scanning technology while Wolf wanted ASCU to count each of its

---

[8] See rent statements, Exhibit H to Memorandum in Support.

[9] Opposition Memorandum at iii-viii. Citations to supporting documents have been omitted.

season passes as equivalent to twenty-three skier visits. ASCU also did not include as part of "paid skier visits," passes which it issued to employees and their families as employee benefits. Using ASCU's calculation method, ASCU achieved 376,006 paid skier visits during the 2005-06 ski season. Under Wolf's method, paid skier visits would have reached 500,000. The two methods of calculation result in a substantial difference in the amount of rent due. Under ASCU's method, it owed rent of approximately $1.64 million. Using Wolf's method, ASCU owed more than $4 million. ASCU sought declaratory relief that it was using the proper methodology for calculating paid skier visits.]

5. [In paragraph 5, Wolf quotes from its counterclaim in the First State Rent Case.]

> In furtherance of its scheme to chip away at Wolf Mountain's rights, ASCU altered the manner in which it calculated "paid skier visits" with respect to season passes. The number of paid skier visits is relevant to rent calculations under the *Ground Lease*. ASCU variously excluded certain categories of revenue and season passes from its calculations and later substantially reduced the number of paid skier visits attributed to each season pass. These actions substantially harmed Wolf Mountain by reducing the rent paid to it under the *Ground Lease*.

6. In March 2008, Wolf . . . filed suit in [the First Federal Rent Case] alleging a discrete breach for failure to pay rent based on certain lodging revenues.

. . . .

8. The 2008 case has nothing to do with calculation of skier days, improper deduction of Westgate tickets in the calculation of paid skier days or revenues from the sale of tickets to Westgate. Nor does it involve the Joint Promotional Agreement or settlement agreement referenced below.

9. The dispute in this case arises from a different transaction. In April 2000, ASC entered into a Joint Promotion Agreement ("JPA") with Westgate Resorts, Ltd. The Joint Promotional Agreement obligated Westgate to purchase 150,000 lift tickets for The Canyons Resort prior to April 1, 2005.

10. A dispute arose between Wolf Mountain and ASCU about whether cash and non-cash consideration paid to ASCU pursuant to the Joint Promotional Agreement obligated ASCU to pay additional rent to Wolf Mountain under the Ground Lease.

5

11. On July 21, 2000, Wolf Mountain and ASCU executed an agreement that provides:

> Wolf Mountain and ASCU agree that any lift tickets paid for from the first $4,100,000 of the ticket proceeds under the Promotional Agreement shall not be counted as "paid skier visits for purpose of Section 3.01 of the Ground Lease, and that any consideration received by ASCU for such $4,100,000 in ticket proceeds shall not be included in the calculation of "Gross S&L Revenues" under said section, but all other amounts and tickets shall be subject to the "paid skier visits" and "Gross S&L Revenues" provisions.

12. Under the Joint Promotional Agreement, Westgate had to purchase the tickets from ASCU before April 1, 2005. Accordingly, under the settlement agreement, ASCU could not deduct revenue or skier visits for tickets sold to Westgate after April 1, 2005.

13. ASCU's rent under the Ground Lease is due annually on September 15. When ASCU paid rent in 2006, 2007, 2008, and 2009, it deducted revenue and skier visits for Westgate tickets.

14. Wolf Mountain assumed that, consistent with the July 2000 settlement agreement, these deductions were for tickets sold to Westgate prior to April 1, 2005, but for which ASCU had deferred its revenue or had not receive[d] payment from Westgate until later.

15. As part of the 2008 lawsuit, in November 2009 Wolf Mountain deposed ASCU's 30(b)(6) designee, John Nadalin. From Mr. Nadalin's testimony about documents introduced as exhibits during his deposition, Wolf Mountain learned for the first time that ASCU was deducting revenue and skier visits for tickets sold to Westgate after April 1, 2005.

16. Until Mr. Nadalin's deposition, Wolf Mountain was unaware that ASCU was deducting revenue and skier days for tickets sold to Westgate after April 1, 2005.

17. About three weeks after Mr. Nadalin's deposition, Wolf Mountain filed this lawsuit against ASCU.

**Discussion**

**Standard for Summary Judgment**

Summary judgment should be granted if the record shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.[10] In deciding a motion for summary judgment, the court reviews the facts in the light most favorable to the nonmoving party.[11]

ASCU contends that Wolf's claims in this case should have been asserted as compulsory counterclaims in the First State Rent Case. Or, alternatively, if Wolf's claims were not compulsory counterclaims in that case, they should have been raised in the Second State Rent Case or in the First Federal Rent Case, and should therefore be dismissed under the common law rule against claim-splitting.

This court looks to state law to determine whether a claim is a compulsory counterclaim, and, if so, the effect of failure to raise the claim in state court.[12] Utah Rule of Civil Procedure 13(a) provides that a pleading "shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject-matter of the opposing party's claim."[13]

---

[10] Fed. R. Civ. P. 56(c)(2).

[11] *Bowling v. Rector*, 584 F.3d 956, 964 (10th Cir. 2009).

[12] *Valley View Angus Ranch, Inc. v. Duke Energy Field Servs., Inc.*, 497 F.3d 1096, 1100 (10th Cir. 2007).

[13] *Yanaki v. Iomed Inc*, 116 P.3d 962, 963 (Utah App. 2005)(quoting Utah R. Civ. P. 13(a)).

Under the common-law rule against claim-splitting, a plaintiff is obligated "to bring all related claims together in the same action."[14] The rule often works as a type of res judicata because it precludes a plaintiff from filing related claims against a defendant in different courts.[15] The question for the court is whether the facts that form the basis for the plaintiff's current claims are part of the same "transaction" asserted in the previous litigation.[16]

ASCU asserts that Wolf's claim in this case arises out of the same transaction as its claims in the other cases, i.e., breach of the Ground Lease, based on claims of rent deficiency. It argues, therefore, that since Wolf failed to raise the claim in those cases, it now is barred from raising it in this case. In opposition, Wolf asserts that it was not obligated to raise its claims earlier because it did not learn until November 2009 that ASCU was deducting revenue and skier visits for tickets sold to Westgate after April 1, 2005. Wolf has supported this assertion with the affidavit of Paul Peters.[17]

In response, ASCU seems to acknowledge that in order for a claim to be barred under the claim-splitting doctrine, the plaintiff must have been "aware of the facts upon which the later claims were based at the time the first suit was filed."[18] ASCU nevertheless asserts that

> Wolf's statements of fact regarding when it first learned that ASCU was subtracting Westgate lift tickets from the annual rent calculation are immaterial. The relevant standard for bringing a compulsory counterclaim under Rule 13(a) is

---

[14] *Stone v. Dep't of Aviation*, 453 F3d. 1271, 1278 (10th Cir. 2006).

[15] *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 986 (10th Cir. 2002).

[16] *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1146, 1149 (10th Cir. 2006).

[17] Affidavit of Paul Peters ¶ 13, attached as Exhibit A to Opposition Memorandum.

[18] Memorandum in Support at 17 (quoting *Hatch*, 471 F.3d at 1148).

when the factual basis for its claim came into existence, and the relevant standard for when claims must be joined to avoid claim splitting is the same.[19]

Case law appears to be against ASCU's position. . For example, the Tenth Circuit has stated that "a plaintiff need only include claims in a suit for res judicata purposes if the plaintiff was aware of the facts upon which the later claims were based *at the time the first suit was filed*."[20]

ASCU further argues that Wolf would have learned that ASCU was making the deductions when it received ASCU's annual written statements calculating rent.[21] ASCU argues that Wolf was therefore obligated to raise its rent claim in the prior litigation.

Although ASCU apparently wants this court to determine that Wolf was aware of the claim asserted in this case at an earlier time, this court may not resolve material factual disputes at the summary judgment stage.[22] "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions not those of a judge . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[23]

---

[19] Defendants' Reply Memorandum in Support of Motion for Summary Judgment ("Reply") at 1 docket no. 21, filed February 25, 2010 (citation omitted).

[20] *Hatch*, 471 F.3d at 1148 (emphasis in original)(quoting *Macris & Assocs., Inc.v. Neways, Inc.* 16 P.3d 1214, 1220 (Utah 2000); *see also Yanaki*, 116 P.3d at 964 (holding that Yanaki's claims should have been brought as compulsory counterclaims in prior litigation because the evidence clearly demonstrated that Yanaki was aware of the existence of his claims prior to filing his counterclaim in the earlier lawsuit).

[21] Memorandum in Support at 12; Reply at 5-7.

[22] *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). *See Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)(stating that "at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

[23] *Anderson v. Liberty Lobby*, 477 U.S. at 255; *accord Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

Accordingly, the court finds that Mr. Peters's affidavit creates a genuine issue of material fact as to whether Wolf was aware of its claim prior to the 2009 deposition of Mr. Nadalin. The court therefore concludes that summary judgment is inappropriate.

**MOTION TO CONSOLIDATE**

Wolf has filed a motion to consolidate this case with the First Federal Rent Case.[24] Under Fed. R. Civ. P. 42, the district court has discretion to consolidate cases involving common questions of law or fact.[25] The court finds that both cases involve the same parties, and common questions of law and fact, and should therefore be consolidated. Under the local rule,[26] this case will be consolidated into the case with the lower case number, *Wolf Mountain Resorts, L.C. v. ASC Utah, Inc.*, No. 2:08-CV-191 TS. All further filings will be in that case.

---

[24] Docket no. 15, filed February 8, 2008.

[25] Fed. R. Civ. P. 42(a)(2).

[26] DUCivR 42-1.

**ORDER**

ASCU's motion for summary judgment is **DENIED**.[27] It is further ordered that Wolf's motion to consolidate is **GRANTED**.[28] Accordingly, this case is consolidated into *Wolf Mountain Resorts, L.C. v. ASC Utah, Inc.*, No. 2:08-CV-191 TS.

June 28, 2010.

BY THE COURT:

/s/ David Nuffer
David Nuffer
United States Magistrate Judge

---

[27] Docket no. 9, filed January 7, 2010.

[28] Docket no. 15, filed February 8, 2008.